**Florencio SOUZA**

v.

**Margaret M. HECKLER, Secretary of Health & Human Services.**

**Civ. A. No. 85–0040 P.**

United States District Court,
D. Rhode Island.

Nov. 8, 1985.

Michael K. Marran, Providence, R.I., for plaintiff.

Michael P. Iannotti, Asst. U.S. Atty., Providence, R.I., for defendant.

## OPINION AND ORDER

PETTINE, Senior District Judge.

Plaintiff, Florencio Souza, brings this action under Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to review a final decision of the Secretary of Health and Human Services denying plaintiff's application for disability insurance benefits. The matter was initially referred to the Honorable Frederick R. De-Cesaris, United States Magistrate, who found that the Secretary's decision was not supported by substantial evidence, and recommended that the plaintiff's motion for disability benefits be granted. The defendant now objects to this recommendation. I concur in the magistrate's recommendation, but differ somewhat in the reasons for my decision, as discussed below. Accordingly, the Secretary's decision is reversed and remanded for disposition consistent with this opinion.

*Factual Background*

The plaintiff filed an application for disability insurance benefits on September 30, 1983, claiming he was disabled as a result of back problems, liver disease, diabetes and ear infection.[1] He is a 52 year old

---

1. Because of the earnings requirements of the Social Security Act, *see* 42 U.S.C. § 423(a) and (c), the plaintiff's insured status expired as of March 31, 1983. To be eligible for benefits, therefore, the plaintiff had to show an inability to engage in any substantial gainful activity for at least twelve consecutive months prior to March 31, 1983. Accordingly, the Secretary only considered the evidence of plaintiff's disability prior to March 31, 1983.

The Secretary indicated that evidence of plaintiff's disability arising subsequent to March 31, 1983, would only be relevant to the issue of continuing disability once the plaintiff had established he was disabled as of March 31, 1983. Because the Secretary found that the plaintiff

individual of Portuguese origin who has completed the equivalent of a high school education. His employment history consists of jobs as a welder mechanic, plumber, and most recently, as an equipment mechanic. He last worked on July 21, 1978.

At the oral hearing before the Administrative Law Judge ("ALJ") on April 27, 1984, the plaintiff testified that he was currently bedridden for between 20 to 22 hours a day, that his daughter dresses and shaves him, that he cannot use the bathroom without help, and that he cannot touch the back of his head, bend over, sit for more than one half hour in one place, stand for more than twenty minutes in one place, or lift more than two to three pounds. He testified that these limitations had increased over the years, but had been "real bad" over the last three or four years (Tr. 36–39, 42).

The plaintiff's daughter also testified at the hearing. She said that her father is in constant pain, when he gets up and walks around or when he sits for too long, that he rarely uses the car because he cannot tolerate the bumps, that he does no work around the house, and that he cannot pull the chair up to the table and sit down. She testified that this inability to move around has plagued her father for the last two and one half to three years, and that his condition has deteriorated throughout that time period. She said that although his walking has worsened since August 1983, well before that time, he could not move quickly, bend down, pick up things, drive, etc. (Tr. 50–54).

The medical evidence in the record comes primarily from the reports and evaluations of two doctors, Drs. Damiani and Pizzarello. There is little in the record to document a disability as it relates to liver disease, diabetes, and ear infection. Apparently the plaintiff was treated for some sort of liver disease in 1968 (Tr. 140). However, in October of 1983, Dr. Damiani indicated that he had no objective evidence to support a diagnosis of cirrhosis and that liver function tests done in the past had been unremarkable (Tr. 178). Dr. Damiani also indicated that while the plaintiff is a latent diabetic, this condition is currently controlled by diet (Tr. 178, 196). However, electromyelogram ("EMG") studies did document a "stocking distribution neuropathy" [2] which by process of elimination had been attributed to the plaintiff's diabetes (Tr. 178, 196). As discussed *infra*, the doctor found this neuropathy to be a cause of the plaintiff's disability.

There was no evidence in the record about the plaintiff's ear condition. There was documentary evidence that the plaintiff had also been treated for hypertension (Tr. 178), loss of consciousness (Tr. 128, 196), and some gastrointestinal distress (Tr. 241). All of these conditions either were treated successfully or are currently under control.

The record contains significantly more medical evidence about the plaintiff's disability as a result of back pain. Apparently, the plaintiff suffered a back injury in 1975 while working (Tr. 114). At that time, Dr. Pache performed an EMG and diagnosed a C7 nerve root irritation, but only minimal on the right side (Tr. 179). Since that time, the plaintiff has complained con-

---

was not disabled as of March 31, 1983, she did not consider plaintiff's additional injuries suffered as a result of a domestic dispute in August 1983 (Tr. 150–52, 198). I, also, for the purposes of this appeal, will not consider this evidence. Given my decision in this case, however, the Secretary must evaluate continuing disability on remand and so must look to this evidence. I also would note, that it is unclear to me why the Secretary did not address plaintiff's eligibility for Supplemental Security Income (SSI) under Title XVI of the Social Security Act if the plaintiff was indeed ineligible for Title II Social Security benefits after March 31, 1983, because of the earnings requirements. If necessary in evaluating post-March 31, 1983, disability, the Secretary should consider the plaintiff's eligibility for SSI benefits.

**2.** A neuropathy is "any of various abnormal states of the nervous system or nerves especially when involving degenerative changes." Webster's Third International Dictionary 1521 (1967).

tinually of mid-dorsal back pain, leg pain and neck pain (Tr. 79).

In September of 1978, the plaintiff was admitted into St. Joseph's Hospital because of a tremendous increase in symptoms over the prior months to the point where all conservative measures including certical steroid injections and traction had not helped. Upon physical examination, Dr. Pizzarello noted that the plaintiff had mild pain and spasm in the low back, marked pain and spasm in the cervical spines, and a restricted range of motion. Dr. Cinquegrana performed EMGs and thought the plaintiff had mild C6 nerve root irritation. Dr. Pizzarello's discharge diagnosis was chronic cervical strain syndrome (Tr. 114, 179).

In early November of 1979, the plaintiff was again admitted into St. Joseph's Hospital for traction plus cervical and lumbar myelograms because he had failed to respond to all conservative measures including hospitalization, traction, physiotherapy, and home traction. On physical examination Dr. Pizzarello noted that the plaintiff's low back was within normal limits except for a mild spasm, that his low back range of motion and cervical range of motion were markedly restricted, that his range of motion at the upper and lower extremities was poor and that his straight leg raising was poor. However, the cervical and lumbar myelograms were entirely within normal limits. Dr. Pizzarello's impression and discharge diagnoses were that the plaintiff had chronic low back and cervical and lumbar disc disease (Tr. 233–36).

Dr. Pizzarello saw the plaintiff in his office almost every month from the end of 1979 through the beginning of 1982. His office notes indicate that the plaintiff continued to have a lot of low back and neck pain as well as paracervical and low back spasm. Dr. Pizzarello treated the patient with conservative measures—traction, physiotherapy, and hot packs. While the plaintiff's condition seemed to improve slightly in May and June of 1980 to the point that the plaintiff was walking upwards of an hour a day, his pain returned in September of 1980, and he began finding it more difficult to walk (Tr. 188, 192). On October 21, 1980, Dr. Pizzarello opined that the plaintiff was totally disabled from substantial gainful employment because of low back, cervical, and medial scapular pain and spasm which the doctor had been unable to treat successfully (Tr. 237).

In January of 1981, the plaintiff's low back began bothering him more, and he had difficulty in standing and a great deal of difficulty in straight-leg raising. Throughout 1981, the plaintiff continued to have the same difficulties with his back and neck. The spasms continued, but the plaintiff's motor strength was satisfactory though certainly restricted, and his reflexes were intact. Dr. Pizzarello indicated that he did not think the patient's condition would change appreciably, but he was unable to locate any peripheral neurological signs. The patient remained unresponsive to the prescribed conservative measures (Tr. 192).

In February of 1982, the plaintiff again had increased difficulties with his neck and mid-dorsal area, but his reflexes were intact, his motor strength good, and there was no sensory loss (Tr. 193). On a form filled out after last seeing the plaintiff on November 22, 1982, Dr. Pizzarello indicated that based on his previous diagnosis and the clinical evidence, the plaintiff had "mild" limitations in walking, bending, standing, sitting, lifting, climbing, and hand dexterity which could be expected to last indefinitely (Tr. 195).

Dr. Pizzarello did not see the plaintiff for some time after this because the plaintiff went to Portugal. When the plaintiff returned, he had the exact same symptomatology as previously. According to Dr. Pizzarello, the plaintiff's symptoms had become very incapacitating, and the conservative measures had still proven unsuccessful. Therefore, on April 15, 1983, the plaintiff again entered the hospital for conservative measures. Upon physical examination, the doctor noted paracervical and paralumbar spasm, interspinous ligament, rhomboid and medical scapular pain, a restricted range of motion secondary to pain and

spasm, weak motor strength, but intact reflexes. The plaintiff was maintained on bed rest and traction and began to show some improvement. The doctor's discharge diagnosis and impression were chronic cervical strain syndrome and chronic lumbar strain syndrome (Tr. 116–118, 127). In 1984, after the plaintiff suffered additional injuries resulting from a domestic dispute,[3] Dr. Pizzarello noted that the plaintiff's prognosis was poor and that he had developed, through time, degenerative disc disease of his back (Tr. 198).

On referral from the Department of Health and Human Services, the plaintiff was seen by Dr. Philip R. Lucas on January 5, 1981, for disability evaluation.[4] Upon physical examination, the doctor noted that the plaintiff had tenderness to percussion in the lumbo sacral spine, that forward flexion of the back to 60 degrees gave him pain along the paravertebral muscles, that straight leg raising gave him back pain at 60 degrees bilaterally, and that his range of motion of the cervical spine was somewhat limited in flexion, rotation, and extension. Dr. Lucas also found that the plaintiff's reflexes and sensations in the lower and upper extremities were intact and that there was no evidence of any sensory, motor, or reflex changes in the upper extremities. X-rays showed some degenerative changes in the cervical and minimal spur formation in the lumbar spine, however (Tr. 238–39). Dr. Lucas' impression of the patient was that he had

> probable degenerative disc disease in both the cervical and lumbar spine. There is no evidence at this point of any

neurologic component suggestive of a herniated disc. I think at the present time the only course of treatment for Mr. Souza would be a vigorous physical therapy program in an attempt to have him return to some sort of light work. At the present time, I find this patient to be disabled for all, including sedentary type work.

(Tr. 239)

Dr. Damiani also saw the plaintiff in 1981. Although Dr. Damiani did not examine the plaintiff primarily for back pain, his focus being the problems of diabetes, hypertension, and peripheral diabetic neuropathy, he noted that the plaintiff had difficulty walking secondary to progressive weakness and pain in his lower extremities bilaterally, a decreased range of motion of his cervical spines, loss of position and vibratory sensation, loss of deep tendon reflexes in the patellas bilaterally and ankles, and a positive Romberg sign (Tr. 189, 178). On June 23, 1981, he also opined that Mr. Souza was totally disabled "secondary to trauma suffered in 1975 and because of as yet unexplained peripheral neuropathy."[5] In a form filled out after last seeing the plaintiff on November 15, 1982, Dr. Damiani indicated that the patient had permanent limitations in walking, bending, standing, sitting, lifting, and climbing, although he did not note the degree of limitation.

A vocational expert was called to testify at the hearing. He said that if he took into account the plaintiff's testimony about difficulty in standing, sitting, leaning, bending, and reaching, there was no light or

---

3. *See* footnote 1 *supra.*

4. The plaintiff originally filed an application for Disability Insurance Benefits on September 15, 1980. Following unfavorable initial and reconsideration decisions, he filed a Request for Hearing on September 17, 1981, but did not appear for a hearing scheduled on April 12, 1982, nor respond to an Order to Show Cause for Failure to Appear at that hearing. Accordingly, his Request for Hearing was dismissed. At the hearing held on April 27, 1984, with respect to the plaintiff's disability application of September 30, 1983, the plaintiff testified that

neither he nor his representative received the April 1982 notice of hearing. The secretary considered the evidence as to this application without regard to the prior dismissal of the Request for Hearing.

5. As discussed above, by process of elimination, Dr. Damiani later attributed the peripheral neuropathy to diabetes. Although Dr. Damiani later said that the plaintiff's diabetes was controlled by medication, the doctor did not indicate any change as to his assessment of disability (Tr. 138).

sedentary work the plaintiff could do.[6] He had no transferable skills. Indeed, there were no jobs in the general economy that the plaintiff could perform (Tr. 56, 62). He further testified that if the plaintiff was limited to lifting 10 to 20 pounds and would have to change his position hourly from sit to stand, and should refrain from bending and stooping, the plaintiff would *not* be able to do the light jobs—pipe wrapping machine operator, and thread inspector—to which his skills were transferable. The plaintiff *would* be able to perform these jobs if he were limited only to the extent that he could sit and stand throughout the day, but had to change his position every hour. But the expert noted that there are no such jobs in this area to any significant degree, and he had no indication of the numbers of such jobs in other regions, being unable to assess that information (Tr. 57–59). As for sedentary jobs, the vocational expert knew of none at the skilled or semi-skilled level to which the plaintiff's skills would be transferable (Tr. 60). But, there would be many unskilled jobs that the plaintiff could perform if he had the capacity to lift 20 pounds, and stand and walk, i.e., if he could perform light work. And seemingly, there would be unskilled benchwork jobs at the sedentary level that the plaintiff could perform as well (Tr. 61).

*Discussion*

To establish his entitlement to benefits, plaintiff must prove that he is disabled within the meaning of the Social Security Act, i.e., that he is unable to perform any substantial gainful work due to a medical condition which can be expected to last for a continuous period of at least 12 months. 42 U.S.C. 416(i)(1), 423(d)(2) and (5). A two-step process is used to determine disability in instances such as the one at bar. First, the plaintiff has the burden of establishing that his physical or mental impairments are of such severity that he is unable to return to his former employment. *Gonzalez Perez v. Secretary of HEW,* 572 F.2d 886 (1st Cir.1978); *Reyes Robles v. Finch,* 409 F.2d 84 (1st Cir.1969). Then, the government must prove that, considering the plaintiff's age, education and work experience, he is able to engage in other substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A); *see Small v. Califano,* 565 F.2d 797 (1st Cir.1977); *Hernandez v. Weinberger,* 493 F.2d 1120 (1st Cir.1974).

In this case, the ALJ decided that plaintiff had in fact met his initial burden of proof. He concluded that "[s]ince July 1978 the claimant was unable to engage in his past relevant work" (Tr. 18). The issue for this Court is whether the Secretary met her burden of proving that the plaintiff could engage in other substantial gainful activity, as defined in the Social Security Act.

The ALJ found that notwithstanding some back discomfort, the plaintiff retained the residual functional capacity through March 31, 1983 to engage in work of a light exertional level. He found the plaintiff's testimony about his condition not credible. The ALJ then applied 20 C.F.R. § 404, subpart P, Appendix 2, Rule 202.10 of the Social Security Regulations (the medical vo-

---

**6.** Light work is defined as follows in 20 C.F.R. § 404.1567(b):

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do seden-

tary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long peiods of time.

Sedentary work is defined in 20 C.F.R. § 404.1567(a):

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

cational grids) and concluded that the plaintiff was not disabled, even in the absence of transferable skills, since he could engage in other substantial gainful activity (Tr. 18).[7] The ALJ decided that the plaintiff was capable of light work and that his testimony was not credible because "the assessment that he suffered from mild impairment of various physical activities [was] much more consistent with the minor findings on examination over a period of many years than the claimant's description of almost total incapacity" (Tr. 16). The ALJ seemingly believed that the evidence did not show a medically determinable impairment which could reasonably be expected to be the cause of the plaintiff's symptoms and pain.

The ALJ's determination, then, rests on a finding that the plaintiff could do light work. Once this determination was made, the vocational expert and the grids were in agreement; if the plaintiff could lift up to 20 pounds and stand and walk or sit most of the time with some pushing and pulling, then there were jobs in the national economy that he could perform. Thus, the key for this case is whether the Secretary's determination as to plaintiff's ability to perform light work is supported by substantial evidence.[8]

The substantial evidence standard is satisfied "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Rodriguez v. Secretary of HHS*, 647 F.2d 218, 222 (1st Cir.1981). I find, after extensively reviewing the record as a whole, that the Secretary's determinations that the plaintiff could perform light work

and that his testimony as to his condition was not credible were not supported by substantial evidence.

■ The plaintiff's subjective testimony as to his pain and limitation of movement was consistent and uncontradicted: he is bedridden most of the day, can perform almost no functions for himself, and is in constant pain. His daughter corroborated this testimony as did Dr. Pizzarello's office notes about the plaintiff's complaints of pain.

■ It is true, as the defendant argues, that claims of pain cannot be accepted blindly and must be evaluated for credibility, motivation and medical impairment, *see Gagnon v. Secretary of HHS*, 666 F.2d 662, 665 (1st Cir.1981), and that the Social Security Disability Benefits Reform Act of 1984, Pub.L. No. 98–460, requires medical signs or findings to support claims of pain. But such evidence clearly exists in this instance.[9] Three doctors independently concluded that the plaintiff was totally disabled from performing any substantial gainful employment, including a doctor to whom the plaintiff was sent by the Social Security Administration. Their conclusions and the medical evidence is uncontroverted; they supplied objective evidence to support the plaintiff's claims of pain.

While in 1979 the doctors did not find any positive evidence of herniated cervical and lumbar disc disease, at various points in time before March 31, 1983, there were medical findings of minimal C7 nerve root irritation, mild C6 nerve root irritation, degenerative changes in the cervical spine,

---

7. Using data from the Dictionary of Occupational Titles about jobs (classified by their exertional and skill requirements), the Medical-Vocational Guidelines or Grids provide rules to determine whether a person can perform *other* substantial gainful activity, where that person is prevented by medical impairment from doing past work. *See* 20 C.F.R. § 404.1569; *see also Heckler v. Campbell*, 461 U.S. 458, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983).

8. Based on the Magistrate's memorandum and recommendation, the parties have argued the issue in this appeal in large part as whether the

Secretary should have disregarded the testimony of the vocational expert and instead relied on the medical-vocational grids. I find no conflict between use of the grids and the expert testimony, however, *if* indeed the plaintiff was capable of performing light work.

9. The case at bar is therefore different from the situation in *Winn v. Heckler*, 762 F.2d 180 (1st Cir.1985), where the court found that the Secretary need not credit the plaintiff's claims of pain where the doctor found no objective evidence to support the plaintiff's occasional claims of pain.

minimal spur formation in the lumbar spine, continual and consistent paracervical and paralumbar spasm, restricted motion in the low back and cervical spine, poor straight leg raising, and a peripheral neuropathy probably attributable to the plaintiff's diabetes. Dr. Pizzarello diagnosed the plaintiff throughout as having chronic low back and cervical strain syndrome. In 1981, Dr. Lucas diagnosed the plaintiff as having probable degenerative disc disease in both the cervical and lumbar spine. And Dr. Pizzarello confirmed this diagnosis in 1984 when he said that *through time*, the plaintiff had developed degenerative disc disease of his back.

The ALJ concluded, however, that these objective medical findings were consistent with a finding of a mild impairment only, and the plaintiff was still capable of performing light work, i.e., lifting up to twenty pounds, walking and standing a good deal or alternatively sitting most of the time, but pushing and pulling. He discounted the findings of total disability by the three doctors because (1) Dr. Damiani did not treat the plaintiff for his muscoloskeletal pain and did not indicate the degree or cause of the plaintiff's impairment; (2) Dr. Pizzarello's opinion of total disability did not assess the plaintiff's capabilities and limitations; and (3) Dr. Lucas' medical findings were too minimal to support a "somewhat puzzling" conclusion of total disability. The ALJ seemed to focus and rely on the negative findings of the 1979 cervical and lumbar myelograms, Dr. Pizzarello's inability to locate peripheral neurological signs, and Dr. Pizzarello's assessment in November of 1982 that the plaintiff's limitations were "mild."

But the ALJ's assessment of the evidence and determination that the plaintiff could perform light work are simply unsupported by the record when viewed as a whole. With respect to Dr. Damiani, while he did indeed treat the plaintiff for conditions other than back pain, his physical examination findings were that the plaintiff had a decreased range of motion, a loss of deep tendon reflexes, a loss of sensation, difficulty walking, and a positive Romberg sign. He also diagnosed a peripheral neuropathy attributable to the plaintiff's diabetes which he found to be a cause of the plaintiff's disability and which was a condition Dr. Damiani was treating the plaintiff for. With respect to Dr. Lucas, the doctor to whom the plaintiff was sent by the defendant, his finding of total disability was based on x-rays showing degenerative changes in the cervical spine, minimal spur formation in the lumbar spine, limited cervical spine range of motion, and poor straight leg raising. This doctor specifically opined that the plaintiff was incapable of performing even sedentary work. As for Dr. Pizzarello, his diagnosis and observations remained consistent throughout a long history of seeing the plaintiff. He found spasm, poor straight leg raising, limited cervical range of motion, and mild and minimal C6 and C7 nerve root irritation; his diagnosis was chronic lumbar and cervical strain syndrome. The doctor's opinion in 1980 that the plaintiff was totally disabled was based on the same, though worsening, symptomatology he observed throughout his contact with the plaintiff. Dr. Pizzarello's one-time indication in November of 1982 that the plaintiff's limitations were "mild" without any indication of the length of time the plaintiff could sit, stand, or walk, or how far he could bend, reach, push or pull, provide no support for the Secretary's conclusion that the plaintiff could do light work.

While the determination of whether the plaintiff was totally disabled is finally for the Secretary and not medical doctors, *see Rodriguez v. Secretary of HHS*, 647 F.2d 218, 223 (1st Cir.1981), here the Secretary has no evidence on which to base her assessment that the plaintiff could perform light or sedentary work. An ALJ's observations at a hearing provide insufficient grounds for rejecting uncontroverted medical opinion, though a claimant's self-serving statements may be disregarded if unsupported by objective evidence. *Bellamy v. Secretary of HHS*, 755 F.2d 1380 (9th Cir.1985). An ALJ simply does not possess the competency to substitute his views on

the severity of the plaintiff's condition in the absence of medical evidence to support his position. *Cf. Grimmett v. Heckler,* 607 F.Supp. 502 (S.D.W.Va.1985) (psychological impairment).

Further, as the Secretary has argued, in enacting the Disability Reform Act of 1984 with respect to the requirement of objective medical evidence to support claims of pain, the Congress sought to work into law the previous administrative regulations dealing with pain. *See Polaski v. Heckler,* 751 F.2d 943, 950 (8th Cir.1984), U.S. appeal pending. In the Eighth Circuit, the Secretary acknowledged that the administrative regulations dealing with pain were as follows:

> While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced. The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. [Emphasis in original.]

*Polaski,* 751 F.2d at 948 (quoting earlier decision, 739 F.2d 1320, 1321–22 (8th Cir. 1984)).

Thus, in this case, even if the objective medical findings do not show a direct cause and effect relationship between the impairment and the degree of the plaintiff's subjective complaints, the Secretary cannot ignore the plaintiff's symptoms and the objective medical findings which do exist. "Symptoms can sometimes suggest a greater severity of impairment than is demonstrated by objective and medical findings alone." *Polaski,* 751 F.2d at 958 (quoting SSR 82–58).

■ Having now evaluated the evidence relating to the plaintiff's condition, I can properly evaluate the use to be given the medical-vocational grids and the testimony given by the vocational expert. Based on my assessment of the record, use of the grids in this case is improper because they are only appropriate where the plaintiff's condition coincides exactly with the criteria of age, education, vocational experience, and residual functional capacity. *See Perez v. Schweiker,* 653 F.2d 997 (5th Cir. 1981). Here, the plaintiff's residual functional capacity was not the same as in the grids. However, there was testimony by the vocational expert based on an accurate portrayal of the plaintiff's condition. He testified that there were no jobs in the national economy that the plaintiff could perform. Given this testimony, the Secretary should have concluded that the plaintiff was disabled within the meaning of the Social Security Act as there was no substantial gainful activity which he could perform.

Accordingly, the plaintiff was entitled to disability benefits prior to the expiration of his insured status on March 31, 1983. The evidence in the record also indicates that the plaintiff continued to be disabled subsequent to that date. However, the Secretary made no determination as to continu-

ing disability because of his decision of no disability as of March 31, 1983. On remand the Secretary must make a determination as to the plaintiff's continuing disability, or alternatively, as to the plaintiff's eligibility for SSI benefits.[10]

Reversed and remanded.